IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WAV, Inc. d/b/a APRIZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 09133 |
| | ) | |
| WALPOLE ISLAND FIRST NATION, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff WAV, Inc., doing business as APRIZ, sued Walpole Island First Nation (WIFN), a native Canadian tribe, alleging that WIFN has failed to pay APRIZ under a contract for wireless internet services and equipment maintenance. WIFN moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. For the reasons set out below, the Court denies the motion.

**FACTS**

Plaintiff APRIZ is an Illinois corporation with its principal place of business in Warrenville, Ill., and operates as a distributor in the wireless broadband market. Compl. ¶ 2–3. WIFN is a native Canadian tribe located on several islands in Ontario, Canada. Def.'s Mot. Dismiss 1.

Before entering into the 2012 contract that is the subject of this dispute, the parties first collaborated on the procurement and installation of a broadband wireless internet system on Walpole Island, Ontario. Following discussions in early 2010, WIFN entered an agreement with Advanced Technology Group LLC (ATG), a business consulting service, for assistance in procuring the wireless system that WIFN would own. Kewayosh Decl. ¶ 3–5. Edward Hudson of

ATG introduced WIFN to APRIZ as a potential source for providing the necessary bandwith for the system that ATG had proposed to WIFN. *Id.* ¶ 6. In 2010, Allen Deleary, WIFN's Director of Operations at the time, and Hudson contacted APRIZ about providing equipment for the planned wireless network on Walpole Island.[1] Linnartz Decl. ¶ 5. WIFN chose to work with APRIZ because of its experience with projects in remote locations and because APRIZ's Illinois location was relatively close to the island, which would minimize travel time and cost. Deleary Decl. ¶ 9-12.

The parties conducted negotiations mainly by telephone and email, *Id.* ¶ 15, and APRIZ does not allege that any WIFN representative ever physically entered Illinois. Service installation on Walpole Island presented some "unique challenges" because of the island's physical characteristics, Linnartz Decl. ¶ 11, and APRIZ prepared a proposal for setting up the network at WIFN's request. *Id.* ¶ 17. This work, evidently, was done without a written contract between WIFN and APRIZ (neither party mentions one, in any event). Ultimately, APRIZ entered into a contract on or about February 18, 2011, with Carousel Industries, which leased most of the equipment for the wireless network project to WIFN, for equipment delivery and installation on the island. Linnartz Decl. ¶ 20.

After APRIZ completed the initial installation of the wireless network, WIFN approached it in August 2011 regarding its interest in improving the network's connectivity. *Id.* ¶ 21-22. "Heavy" negotiations followed, and APRIZ agreed to nearly-wholesale prices based on the hope

---

[1] George Linnartz, APRIZ's Director of Services, states in a declaration submitted by APRIZ that the first contact was made by Deleary and Hudson. WIFN argues in its reply that "these people did not meet personally until much later," Def.'s Reply 2, and notes that Deleary does not state in his own declaration that he participated before signing the agreement, but this argument is not supported by any affirmative evidence. The sole declaration WIFN filed, by Chief Burton Kewayosh, states only that Hudson "introduced" WIFN to APRIZ after representing to WIFN that the wireless system would need an increase in bandwidth. Kewayosh Decl. ¶ 5-6.

of "performing similar work for other First Nation bands in the future." *Id.* ¶ 24. The parties entered into the Wireless Internet Backhaul Agreement (Agreement) at issue in this litigation in April 2012. *Id.* ¶ 25. Deleary signed the agreement on WIFN's behalf, Kewayosh Decl. ¶ 7, and APRIZ Director of Services George Linnartz signed it in Illinois the next day. Linnartz Decl. ¶ 25. In exchange for monthly service fees plus late fees, APRIZ was required to provide a service connection and to maintain related equipment. The Agreement was to be in effect for five years, followed by an automatic one-year renewal unless either party terminated it. The Agreement contains an Illinois choice-of-law provision, but no forum selection clause.

APRIZ and WIFN engaged in eighty-three phone calls from about July 2011 through October 2012, and twenty-eight of those were from Canada to Illinois—*i.e.*, from WIFN to APRIZ. Linnartz Decl. ¶ 28. Linnartz's cell phone records indicate another 135 calls with Ontario phone numbers from March 23, 2011 through May 23, 2012, and most of these calls were with WIFN representatives. *Id.* ¶ 29. These calls are a fraction of the total calls between the parties, as APRIZ's phone records date back only three years. *Id.* ¶ 30. APRIZ representatives traveled to Walpole Island at WIFN's request at least ten times between October 2011 and June 2012. *Id.* ¶ 31-32. In connection both with the initial project and the Agreement, APRIZ performed work in its Illinois offices including "(1) reviewing and analyzing the information provided by WIFN regarding Walpole Island's topography, infrastructure, and technological capabilities; (2) preparing all proposals for the work performed; (3) ordering equipment needed for the projects; and (4) generating reports on the projects." Linnartz Decl. ¶ 35.

According to Burton Kewayosh, Chief of WIFN, ATG was not able to produce a functioning wireless internet program, and the project was considered a failure. Kewayosh Decl. ¶ 8. This lawsuit ensued.

**DISCUSSION**

WIFN argues that the Court lacks personal jurisdiction because the Agreement contained an Illinois choice-of-law provision but did not stipulate to Illinois jurisdiction; the parties agreed that performance of the Agreement would occur, and did partly occur, in Ontario and nowhere else; the Agreement was negotiated by the parties in Ontario and nowhere else; and no WIFN representative ever appeared in Illinois. APRIZ responds that the Court does have personal jurisdiction because WIFN purposefully established sufficient contacts with Illinois by initiating a business relationship with APRIZ; maintaining that relationship over a period of two years through telephone and email contacts, as well as in-person visits from APRIZ representatives to Walpole Island at WIFN's request; negotiating as an active purchaser; and entering a contract which contained an Illinois choice-of-law clause and which was "largely negotiated and performed in Illinois."

After a defendant moves to dismiss a complaint for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of showing that such jurisdiction exists. *Purdue Research Found. v. Sanofi-Synthelabo*, 338 F.3d 773, 782 (7th Cir. 2003). To defeat a motion to dismiss without an evidentiary hearing, the plaintiff must only establish "a prima facie case of personal jurisdiction." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). The Court must accept all well-pleaded facts in the complaint as true, and resolve any factual disputes in the declarations in the plaintiff's favor. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). While the parties in this case disagree over how to characterize certain aspects of their relationship, there are no meaningful factual contradictions between the parties' affidavits.

A federal court sitting in diversity has personal jurisdiction if a state court in that forum state would have personal jurisdiction. *Citadel Grp. Ltd. v. Washington Regional Medical*

*Center*, 536 F.3d 757, 760 (7th Cir. 2008). APRIZ asserts in its complaint that this Court can exercise specific personal jurisdiction over WIFN pursuant to 735 ILCS 5/2-209(a)(7), the section of the Illinois long-arm statute applicable to causes of action arising from "[t]he making or performance of any contract or promise substantially connected with this state." The long-arm statute also contains a "catch-all" provision which "permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions." *Hyatt Int'l Corp.*, 302 F.3d at 714 (internal quotation marks omitted) (citing 735 ILCS 5/2–209(c)).

The Illinois long-arm statute is "coextensive with the due process requirements of the Illinois and United States Constitutions," and so the analysis focuses on the single issue of whether exercising personal jurisdiction satisfies constitutional due process. *Graver v. Pinecrest Volunteer Fire Dept.*, 6 N.E.3d 251, 257 (Ill. App. Ct 2014). To exercise specific personal jurisdiction,[2] this Court must conclude that WIFN established "certain minimum contacts" with Illinois "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). For there to be personal jurisdiction, a defendant "should reasonably anticipate being haled into court in the forum state" because it "has purposefully availed itself of the privilege of conducting activities there." *Kinslow v. Pullara*, 538 F.3d 687, 691 (7th Cir. 2008) (quoting *Hyatt Int'l Corp.*, 302 F.3d at 716 (alterations, citations, internal quotation marks omitted).

---

[2] General personal jurisdiction "is proper only when the defendant has continuous and systematic contacts with the state in question," and allows a court to exercise personal jurisdiction even where the dispute does not arise out of or relate to the defendant's contacts in the forum. *Hyatt Int'l Corp.*, 302 F.3d 707, 713. Specific jurisdiction is more limited, and provides for personal jurisdiction only for "controversies that arise out of or are related to the defendant's forum contacts." *Id.* APRIZ does not contend that the requirements of general jurisdiction have been met.

The requirements for establishing specific personal jurisdiction are: "(1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state, (2) the alleged injury must have arisen from the defendant's forum-related activities, and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland*, 682 F.3d at 673 (internal citations omitted). Although WIFN's contacts with Illinois were not extensive, they suffice to meet these minimum standards.

WIFN correctly points out flaws in some of APRIZ's arguments for exercising personal jurisdiction. For example, APRIZ argues that the Agreement was "largely negotiated and performed in Illinois."[3] But APRIZ's argument that *it* performed many of its contractual obligations in Illinois does little to support personal jurisdiction, because those activities were unilateral actions by APRIZ that only serve to further show that APRIZ's principal place of business is in Illinois.[4] "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). WIFN's argument that it is the defendant's performance of the contract that matters, not the plaintiff's, is also well-taken. *See Forrester v. Seven Seventeen HB St. Louis*, 336 Ill.App.3d 572, 578, 784 N.E.2d 834, 838 (4th Dist. 2002) ("The relevant inquiry is not whether the plaintiff partially performed the contract in Illinois, but whether the

---

[3] APRIZ argues that the contract was formed in Illinois when a APRIZ representative in this state was the last to sign it, and that most of its performance of contractual obligations happened in its Illinois offices including: "(1) reviewing and analyzing the information provided by WIFN regarding Walpole Island's topography, infrastructure, and technological capabilities; (2) preparing proposals for the work performed; (3) ordering equipment for the projects; and (4) generating reports on the projects." Linnartz Decl. ¶ 35.

[4] This is the case regardless of how APRIZ obtained the topography, infrastructure, and technological capabilities information, a point on which the parties disagree.

defendant performed any part of the contract in Illinois.") (internal quotation marks omitted). Any performance by WIFN under the contract would include paying APRIZ and accommodating APRIZ's maintenance of the equipment in Canada, and neither act would occur in Illinois.[5] APRIZ also does not dispute that no WIFN representative traveled to Illinois for negotiations; thus, only one side of the Agreement—APRIZ's—was negotiated in Illinois.

On the whole, however, APRIZ has the better arguments. First, WIFN initiated the relationship here. In a personal jurisdiction analysis, "[o]ne relevant inquiry is which party initiated the business transaction." *Heritage House Restaurants, Inc. v. Continental Funding Grp., Inc.*, 906 F.2d 276, 283 (7th Cir. 1990) (citing *Madison Consulting Grp. v. South Carolina*, 752 F.2d 1193, 1202 (7th Cir. 1985)). Although in this circumstance WIFN was seeking to purchase services rather than to provide them, the fact remains that WIFN targeted a company in Illinois for business purposes. WIFN actually valued APRIZ's Illinois location for its relative proximity to Walpole Island. WIFN's use of a third-party consultant also does not detract from this aspect of the analysis; as the Seventh Circuit noted in *Heritage House*, § 2–209(a) of the Illinois long-arm statute covers actions taken through an agent. 906 F.2d at 281.

The phone, email, and in-person contacts between the parties over the course of two years also support personal jurisdiction, despite WIFN's argument that many of those contacts involved WIFN's complaints about the system's performance. While the parties' relationship here was not necessarily "naturally based" on phone and mail contacts, as in *Heritage House*,[6]

---

[5] See *Ameritech Services, Inc. v. SCA Promotions, Inc.*, 2000 WL 283098, *4 (N.D. Ill. March 6, 2000) (stating that if the Texas-based defendant had to perform under the contract, it would "draw a check in Texas from a Texas bank and send it to Illinois").

[6] "Where a relationship is naturally based on telephone and mail contacts, these contacts can justify jurisdiction over a defendant." 906 F.2d at 281. The Seventh Circuit in *Heritage House* found that the parties' relationship was naturally based on phone and mail contacts where the defendant provided investment information to the plaintiff.

7

these contacts are still relevant. In *Burger King Corp. v. Rudzewicz*, the Supreme Court held that "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" are all factors for consideration in a minimum contacts analysis. 471 U.S. 462, 479 (1985). Similar to the defendant in *Burger King*, here WIFN "knew that [it] was affiliating [itself] with an enterprise based primarily" in Illinois and also took part in regular, direct communications with the plaintiff's Illinois office via telephone and mail. *Id.* at 480-81. The five-year term of the Agreement further shows that WIFN committed to continuing a long-term relationship with APRIZ. Moreover, although any communications prior to August 2011—when WIFL approached APRIZ about entering the Agreement at issue here—may not have been directly related to the Agreement, the two projects APRIZ worked on for the wireless internet system were sufficiently related to constitute a continuing relationship.[7] These earlier communications by phone and mail are thus relevant for purposes of personal jurisdiction.

APRIZ also argues that WIFN is an "active purchaser" subject to personal jurisdiction because it solicited APRIZ's services and aggressively negotiated to buy customized products and services. Illinois law distinguishes between "active" purchasers, who are deemed to have submitted to jurisdiction in the seller's forum, and "passive" purchasers, who have not: "[a] 'passive purchaser' is one who places orders at the seller's price, and an 'active purchaser' is one who takes a more aggressive intrusive role in purchasing by going to inspect the seller's production facilities or vigorously negotiating contract terms." *Belle-Aire Fragrances, Inc. v.*

---

[7] "[I]t is only the dealings between the parties in regard to the disputed contract that are relevant to minimum contacts analysis." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997) (internal quotation marks omitted). However, a "continuing relationship or obligation" between two parties based on similarities between the disputed and prior transactions can support personal jurisdiction. *Id.* at 1279 (citing *Heritage House*, 906 F.2d at 284). See also *Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 716-17 (7th Cir. 2002) (finding that a "continuous series of contacts" between the parties was relevant in the personal jurisdiction analysis even if the parties' legal relationship "may have shifted" during that time).

*Odorite Int'l*, *Inc.*, 898 F. Supp. 621, 624 (N.D. Ill. 1995) (citing *G.M. Signs, Inc. v. Kirn Signs Inc.*, 231 Ill. App. 3d 339, 343, 596 N.E.2d 212, 215 (2nd Dist.1992)). *See also, e.g., Wiggen v. Wiggen,* 2011 IL App (2d) 100982 ¶ 31, 954 N.E.2d 432, 439 ("we distinguish between active and passive purchasers"). This distinction protects "both the due process rights of the ordinary mail order purchaser and the legitimate interests of sellers who manufacture custom-built products according to a nonresident buyer's specifications." *G.M. Signs*, 231 Ill.App.3d at 343, 596 N.E.2d at 215 (internal quotation marks omitted).

WIFN's participation in heavy negotiations for the provision of services specifically tailored for Walpole Island make it an active purchaser. Although WIFN correctly argues that courts have typically applied this distinction in the context of products, as opposed to services, and have also found active purchaser conduct to be more common in transactions "between major business organizations than in transactions in which a consumer or even a small shopkeeper is the purchaser," *Chalek v. Klein*, 193 Ill.App.3d 767, 773, 550 N.E.2d 645, 649 (2d Dist. 1990), the underlying rationale applies in this case, too. WIFN is not akin an "ordinary mail order purchaser" who made a one-off decision to buy the seller's stated terms; instead, it engaged in extensive negotiations for a customized service provided by an Illinois company, one with whom litigation was foreseeable.

The Agreement's Illinois choice-of-law provision also supports personal jurisdiction. Such a clause can support jurisdiction where other contacts with the forum state are present because it tends to show that a party purposefully availed itself of that state's laws. *Burger King*, 471 U.S. at 482. Although the Agreement is a form contract drafted by APRIZ, WIFN's active negotiation of other contractual terms suggests that it was able to negotiate with respect to this

provision as well, but did not, or did not do so successfully.[8] Also weighing in favor of personal jurisdiction, albeit only slightly, is APRIZ's argument that the contract was "formed" in Illinois because that is where the final signature was attached. That is accurate, but an essentially random sequence by which signatures are affixed to a contract seemingly provides little substance to the evaluation of whether WIFN purposely availed itself of the privilege of conducting business activity in Illinois.

There is also no doubt that APRIZ's breach of contract claim "arises out of" WIFN's contacts with Illinois. WIFN's alleged refusal to perform the obligations of a contract it negotiated and entered with APRIZ, an Illinois company, gives rise to the claim. WIFN initiated its relationship with APRIZ in the first instance and in negotiations regarding the Agreement at issue, and the parties' contacts regarding the earlier project are part of their ongoing relationship.

Finally, exercising personal jurisdiction here also comports with notions of fair play and substantial justice. Factors in this analysis may include "the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (internal quotation marks omitted). Illinois has a clear interest in adjudicating claims brought by a business located in this forum and APRIZ's interest in obtaining convenient and effective relief further weighs in favor of personal

---

[8] WIFN believes the absence of a forum selection clause should be construed against APRIZ, but the question here is not whether the parties agreed on a forum in which to litigate disputes arising from the contract—plainly, they did not—but whether the contract and the events relating to its negotiation and performance provide a sufficient nexus to Illinois to permit the exercise of personal jurisdiction over the parties. The absence of a forum selection clause may mean that disputes arising from this contract can also be brought in Canada; it does not mean that a court in Illinois does not have personal jurisdiction over WIFN in a suit brought here.

jurisdiction. At the same time, the burden on WIFN of having to litigate in Illinois is likely lessened by the forum's relative proximity to Walpole Island. Moreover, based on these facts, there is no other state in the United States where the parties would litigate; granting the motion would thus force APRIZ to litigate internationally if it chooses to pursue its claim.

In cases where the defendant is an international citizen, courts weighing the interest of the "several states" in the advancement of policies and efficient judicial resolution should consider "the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction" by a court in the forum state. *Asahi Metal Indust. Co. v. Superior Court of Cal.., Solano Cnty.*, 480 U.S. 102, 115 (1987) (emphasis in original). Those interests are best addressed by considering the reasonableness of jurisdiction and "an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum state." *Id.* WIFN has not argued that there is a "serious burden" in litigating in Illinois, nor has it argued that the procedural or substantive polices of Canada or its own sovereign law are at risk; on the other hand, the plaintiff's interests in litigating in its home country—let alone its home state—are not "minimal."

Taken together, WIFN's actions in initiating a relationship with APRIZ, maintaining continual communications over two years that were necessary to the ongoing services WIFN sought from APRIZ, performing an active role in the transaction, committing to a long-term business relationship with APRIZ through a five-year contract, and agreeing to an Illinois choice-of-law clause in a contract formed in Illinois made it foreseeable that WIFN could be haled into court in Illinois. The breach of contract claim arises out of WIFN's contacts in Illinois, and exercising personal jurisdiction also comports with notions of fair play and substantial justice. Therefore, the motion to dismiss is denied.

Date: June 6, 2014

John J. Tharp, Jr.
United States District Judge